USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/15/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**DARRYL JOHNSON,**

**Petitioner,**

**-against-**

**M. CAPRA,**

**Respondent.**
-----------------------------------------------------------------X

**22-CV-10754 (JLR)(SN)**

**REPORT AND RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE JENNIFER L. ROCHON:**

Petitioner Darryl Johnson ("Petitioner"), proceeding *pro se*, petitions under 28 U.S.C. § 2254 for a writ of habeas corpus setting aside his conviction. See ECF No. 1, Petition ("Pet."). Petitioner raises five grounds for habeas relief: (1) that the victim's identification of him as the perpetrator was tainted ("Ground One"); (2) that the evidence against him at trial was legally insufficient ("Ground Two"); (3) that his arrest was not supported by probable cause ("Ground Three"); (4) that his trial counsel was ineffective ("Ground Four"); and (5) that the prosecutor improperly acted as an unsworn witness and bolstered the victim's testimony ("Ground Five"). Id. I recommend that the Petition be DENIED in its entirety.

## BACKGROUND

### I. Criminal Conviction

In February 2018, Petitioner and his co-defendant, John Weathers ("Weathers"), were convicted of two counts of first-degree robbery, first-degree assault, second-degree robbery, and two counts of second-degree criminal possession of a weapon in relation to a robbery and shooting perpetrated against Conrad Manoyrine ("Manoyrine"). See id. at 1–2; ECF No. 18-8 at

149–52.[1] The facts in this Report and Recommendation are drawn primarily from the testimony and evidence presented at Petitioner's pretrial suppression hearing and trial.

**A. The Crime, Investigation, and Trial Evidence**

On August 8, 2016, Manoyrine's friend, Weathers, called Manoyrine to ask him how much he paid for the jewelry that Manoyrine wore when they would go out together. See ECF No. 18-6 at 134–37. Manoyrine told Weathers that his jewelry was worth approximately $50,000 to $60,000. Id. at 136. Later that night, Manoyrine and Weathers went out to a club in Manhattan called the Mazaar Lounge. Id. at 135–36. Manoyrine was wearing his jewelry when they went out that night. Id. at 143. Manoyrine and Weathers arrived at the club in separate cars at approximately 1:00 a.m. on August 9, 2016. Id. at 138. Around the same time, Petitioner and two other men allegedly arrived at the Mazaar Lounge in a red BMW that belonged to Petitioner's mother. See ECF Nos. 18-3 at 156–59; 18-6 at 330–32, 558–60; 18-7 at 49–50; People's Trial Exhibit No. 7.[2] The man alleged to be Petitioner was caught on the club's surveillance video wearing a Metallica band T-shirt that night. See ECF No. 18-7 at 34.

At approximately 3:00 a.m., Manoyrine left the Mazaar Lounge without Weathers and started to head back home. See ECF No. 18-6 at 147–49; People's Trial Exhibit No. 7. Immediately after Manoyrine left the club, the man alleged to be Petitioner and the two other men he arrived with also exited the club. See People's Trial Exhibit No. 7. Weathers was also seen on surveillance video exiting the club around the same time and conferring outside of the

---

[1] The cited pages refer to the ECF-stamped page numbering.

[2] In support of their opposition to the Petition, Respondent conventionally filed with Chambers three compact disks containing a copy of the People's Exhibit Nos. 7, 35, and relevant excerpts of Exhibit 5C presented at trial. See ECF No. 20. Because these exhibits contain video files, they could not be docketed through ECF.

club with the man alleged to be Petitioner. Id. Cell phone records show that Weathers maintained in frequent communication with Petitioner throughout the night. See ECF No. 18-3 at 143–49.

Shortly after Manoyrine left the club, Weathers called Manoyrine and told him to come back to the Mazaar Lounge. See ECF No. 18-6 at 149–50. Weathers falsely claimed that he was outside with "two girls" and told Manoyrine to drive up front of the club. Id. Manoyrine promptly returned and parked in front of Weathers's car, which at the time was double-parked in front of the club. Id. Weathers, however, was not in his car or in front of the club with "two girls" as he claimed. Id. at 150.

As soon as Manoyrine got out of his car to look for Weathers, the man wearing the Metallica T-shirt (alleged to be Petitioner) and another one of the men who was seen in the red BMW that night approach Manoyrine. See ECF No. 18-6 at 151–54, 213–14; People's Trial Exhibit No. 7. The man in the Metallica T-shirt had a gun in his hand and demanded Manoyrine's jewelry. Id. Manoyrine took off some of his jewelry and gave it to the man with the gun. Id. Manoyrine then began to run away but was immediately shot in the leg. Id. At that point, the man in the Metallica T-shirt ran away toward the red BMW that was parked nearby. See People's Trial Exhibit No. 7. The other perpetrator ran to Manoyrine, who was on the ground, took the rest of Manoyrine's jewelry, and then also fled in the direction of the red BMW. See ECF No. 18-6 at 151–54, 213–14; People's Trial Exhibit No. 7. License plate reader data presented at trial shows that the red BMW left the crime scene shortly after and drove towards Brooklyn, which is where Petitioner lived. See ECF Nos. 18-3 at 160–67; 18-6 at 334–38.

Shortly after Manoyrine was shot, Weathers suddenly appeared and asked Manoyrine what happened. See ECF No. 18-6 at 154–55. Manoyrine accused Weathers of orchestrating the

robbery and getting him shot. Id. Weathers then helped Manoyrine into his car to take Manoyrine to a hospital. Id.

At approximately 3:30 a.m. on August 9, 2016, the New York Police Department ("NYPD") responded to a report of the shooting. ECF No. 18-5 at 15–16. Upon arriving at the crime scene, the police found Weathers and Manoyrine in Weathers's car and were told that Manoyrine was shot. Id. at 16–19. The police called for an ambulance that transported Manoyrine to a hospital. Id. at 19–20. Meanwhile, based on phone records presented a trial, Weathers and Petitioner called each other several times. See ECF No. 18-3 at 129–55. They stayed in frequent communication with each other in the days after the shooting. Id.

Detective Vidal of the NYPD interviewed Weathers on August 9, 2016. See ECF No. 18-6 at 468. Weathers admitted to asking about Manoyrine's jewelry before the robbery but denied seeing the crime take place or knowing the robbers. Id. at 468–80. Over the course of the following days, the police reviewed surveillance footage of the crime, Weathers's phone records, and license plate reader data. Id. at 480–500. Petitioner soon became a suspect given his frequent communication with Weathers around the time of the incident and his connection to the red BMW. Id.

In the course of his investigation, Detective Vidal also reviewed Petitioner's Facebook profile and discovered a photograph of Petitioner wearing a Metallica T-shirt. Id. at 565. Although Detective Vidal could not determine for certain whether it was the same Metallica T-shirt that the shooter wore, id., subsequent comparisons between photos of Petitioner and images of the shooter revealed matching arm tattoo designs. See ECF No. 18-4 at 2–18; ECF No. 18-7 at 30–34; People's Trial Exhibit No. 35.

Eleven days after the robbery, the police showed Manoyrine a photo array, which included an image of Petitioner. See ECF Nos. 18-2 at 83; 18-6 at 587–89. At first, Manoyrine could not identify anyone as the perpetrator. See ECF No. 18-6 at 589. Manoyrine testified at trial that he was unable to initially identify anyone because he "still was in shock" after having been shot. Id. at 161. A few days later, however, Manoyrine contacted the assigned prosecutor and told him that he did in fact recognize someone in the photo array. Id. at 162–63.

Approximately three weeks after the crime, the police located the red BMW in Queens. See ECF No. 18-6 at 506. Petitioner was not driving the vehicle at the time, but the police subsequently found his driver's license and Social Security card inside. Id. at 513, 670–71. Thereafter, Petitioner was arrested and brought in for a lineup identification. Id. at 520. Manoyrine viewed the lineup and identified Petitioner as the person who had robbed and shot him. Id. at 163–66.

At trial, Petitioner had his mother and two friends, Anthony Whitehead ("Whitehead") and Michael Jean Baptiste ("Jean Baptiste") testify in his defense. Whitehead and Jean Baptiste testified that they were outside of the Mazaar Lounge when the shooting occurred and that they recognized a different man, Ranger Chery ("Chery"), as the perpetrator. See ECF No. 18-7 at 116–36, 262–73. On rebuttal, however, Chery testified that he had never been to the Mazaar Lounge and was not in Manhattan on the night of the incident. Id. at 389–90, 395–400. Chery's claim was corroborated by cell site data showing that he was not near the Mazaar Lounge during the crime. Id. at 442–43; ECF No. 18-8 at 75. Moreover, surveillance footage showed that, contrary to Whitehead's testimony, Whithead left the Mazaar Lounge shortly before the shooting occurred. See People's Trial Exhibit No. 5C; ECF No. 18-7 at 364–68.

### B. The Verdict and Sentence

Following a jury trial in the New York Supreme Court, New York County, Petitioner and his co-defendant, Weathers, were found guilty of two counts of first-degree robbery, first-degree assault, second-degree robbery, and two counts of second-degree criminal possession of a weapon. See Pet. at 1–2; ECF No. 18-8 at 149–52.

On February 28, 2018, Petitioner was sentenced to six concurrent ten-year terms of incarceration, to be followed by five years of post-release supervision. See Pet. at 1; ECF No. 46. According to the New York State Department of Corrections and Community Supervision's website, Petitioner is scheduled to be released from the Greene Correctional Facility on August 23, 2026. See ECF No. 45. However, because his conviction includes a term of post-release supervision, his habeas petition will not be mooted by his conditional release. See United States v. Wiltshire, 772 F.3d 976, 979 (2d Cir. 2014); Levine v. Apker, 455 F.3d 71, 77 (2d Cir. 2006) ("[T]his court may provide habeas relief as law and justice require, which could include a reduction in the petitioner's term of supervised release.") (internal quotation marks and citation omitted).

## II. Post-Conviction Procedural History

On October 1, 2020, Petitioner filed an appeal of his conviction with the New York Appellate Division, First Department. See ECF No. 18-2 at 11–77. On appeal, Petitioner raised largely the same arguments he is raising in his habeas petition: (1) that the lineup and in-court identification were tainted because Manoyrine initially viewed a photo array containing an image of Petitioner; (2) the evidence against him at trial was legally insufficient and the verdict was against the weight of the evidence; (3) the police lacked probable cause for his arrest; (4) his trial counsel was ineffective for failing to investigate Whitehead's claims and presenting a faulty

third-party culpability defense; and (5) the prosecutor acted as an unsworn witness during Manoyrine's direct examination and improperly bolstered his testimony. See id.

On June 17, 2021, the Appellate Division unanimously affirmed Petitioner's conviction and rejected all his claims. See People v. Johnson, 195 A.D.3d 526 (1st Dep't 2021); ECF No. 18-3 at 101–03. Petitioner filed a leave application re-raising the same claims, however, the New York Court of Appeals denied him leave to appeal. See People v. Johnson, 37 N.Y.3d 1097 (2021); ECF No. 18-3 at 127.

On December 19, 2022, Petitioner filed his habeas petition (the "Petition") challenging his conviction and raising the same claims he raised on appeal. See ECF No. 1. Respondent answered the Petition on June 26, 2023. See ECF Nos. 17–18. The Court thereafter stayed the Petition so that Petitioner could exhaust his then-unexhausted ineffective assistance of counsel claim by filing a motion in state court pursuant to Criminal Procedure Law § 440.10. See ECF No. 30. Petitioner subsequently filed his § 440.10 motion, which the state court denied on January 8, 2024. See ECF No. 43-2 at 39–43. Petitioner sought leave to appeal the denial of his § 440.10 motion but the Appellate Division denied his leave application. See id. at 44–54, 60. Accordingly, the Court lifted the stay on November 8, 2024. See ECF No. 34. After the stay was lifted, Respondent filed a supplemental memorandum of law in opposition to the Petition, specifically addressing the now exhausted ineffective assistance of counsel claim. See ECF No. 43.

## STANDARD OF REVIEW

Before a federal court may review a § 2254 habeas petition, a petitioner must exhaust all remedies provided in state court. See 28 U.S.C. § 2254(b)(1)(A). A claim is deemed exhausted if the petitioner "fairly present[ed] his claim in each appropriate state court (including a state

supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004).

Petitioner's claims are exhausted. Petitioner fully briefed the same claims he is raising here at the state court appellate level, and Petitioner explicitly cited constitutional grounds for relief. See ECF Nos. 18-2 at 11–77; Reid v. Senkowski, 961 F.2d 374, 376 (2d Cir. 1992) (per curiam) (stating that "a minimal reference" to a constitutional claim satisfies the exhaustion requirement). Petitioner also filed a § 440.10 motion raising the same ineffective assistance of counsel claim he is raising in his Petition. See ECF No. 43-2 at 1–18. All of his claims were denied, and his applications for leave to appeal were rejected by the state Court of Appeals. See ECF Nos. 18-3 at 101–03, 127; 43-2 at 39–43, 60. Therefore, because the same claims that Petitioner is raising here were fairly presented to New York's highest courts and were denied, his habeas claims are deemed exhausted.

Once the exhaustion requirement is satisfied, a state prisoner seeking habeas relief under § 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the standard of review of a federal habeas corpus petition "depends upon whether the petitioner's claims have previously been 'adjudicated on the merits' by a state court." Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006) (quoting 28 U.S.C. § 2254(d)). In addition, under the AEDPA standard, a federal court on habeas review of a state court's adjudication on the merits must examine whether the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d); see Johnson v. Williams, 568 U.S. 289, 292 (2013); Spears, 459 F.3d at 203. When applying these standards of habeas review, the court reviews the state court's "last reasoned decision." Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991).

"A state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in" Supreme Court precedent, "or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] [Supreme] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005). A state court decision constitutes an "unreasonable application" of the Supreme Court's precedent if "the state court applies [that] precedent[] to the facts in an objectively unreasonable manner." Id. Thus, in construing and applying federal law, even erroneous state court decisions that are deemed reasonable will survive habeas review. See Williams v. Taylor, 529 U.S. 362, 409–13 (2000). It follows that "federal habeas corpus relief does not lie for errors of state law," absent a corresponding violation of federal constitutional rights. Estelle v. McGuire, 502 U.S. 62, 67 (1991) (internal quotation marks and citation omitted). For federal habeas review, factual determinations made by a state court are presumed correct, and a petitioner bears the burden of rebutting this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Accordingly, the standard under the AEDPA is a highly deferential, "requiring courts to assess whether the state courts decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Garner v. Lee, 908 F.3d 845, 861 n.14 (2d Cir. 2018) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

Finally, Courts liberally construe pleadings prepared by *pro se* litigants and hold them "to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). It is therefore appropriate to interpret *pro se* submissions to "raise the strongest arguments that they suggest." Gomez v. Brown, 655 F. Supp. 2d 332, 342 (S.D.N.Y. 2009) (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)).

## DISCUSSION

### I. Tainted Identification Claim (Ground One)

Petitioner argues that the photo array that Manoyrine was initially shown tainted the subsequent lineup identification and, therefore, such identification evidence should not have been admitted at trial. See Pet. at 27–28. Petitioner raised this claim on direct appeal, and the Appellate Division rejected it on its merits. See ECF No. 18-3 at 101–03. Accordingly, the deferential standard of review under the AEDPA applies, and the Court examines whether the Appellate Division's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The governing Supreme Court precedent regarding the admission of identification evidence provides that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). In addition, if a pretrial identification procedure is found to have been "impermissibly suggestive," the state court must then have considered whether the identification was nonetheless

reliable. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see also Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986) (noting that "if the [identification] procedures were not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility").

Petitioner does not expressly assert that the photo array that Manoyrine was shown or the subsequent lineup were "impermissibly suggestive." Simmons, 390 U.S. at 384. But in an effort to liberally construe the Petition given Petitioner's *pro se* status, the Court interprets his claim that the lineup was "irreparably tainted" as raising a claim that the identification procedures were "impermissible suggestive." See Pet. at 27. A review of the underlying record, however, shows that the Appellate Division applied the correct standard in assessing Petitioner's claim regarding the identification evidence and reasonably rejected it on its merits. The Appellate Division assessed whether the lineup was tainted by Manoyrine's prior exposure to Petitioner's photograph and determined that "[t]he passage of 2½ months between the photo array and the lineup rendered it unlikely that the victim's attention was drawn to [Petitioner] at the lineup simply because he had previously seen his photo." ECF No. 18-3 at 101 (internal citations omitted). Moreover, as the Appellate Division noted, the fact that Manoyrine did not immediately recognize Petitioner in the photo array does not inherently mean that Manoyrine's subsequent identification of Petitioner as the shooter was somehow tainted. Id.

Petitioner also points to no evidence of undue suggestiveness in any of the police's identification procedures. "[T]he law is clear that the police may use more than one identification procedure to identify suspects as long as the procedures utilized are fair and not suggestive." Taylor v. Kuhlmann, 36 F. Supp. 2d 534, 551 (E.D.N.Y. 1999) (concluding that it was not improper for a witness to view photo arrays before a lineup where the procedures used were not unduly suggestive); see also Perez v. Smith, 791 F. Supp. 2d 291, 315 (E.D.N.Y. 2011) (finding

that photo arrays that were not unduly suggestive did not taint pretrial lineups and trial identifications); Ragunauth v. Ercole, No. 07-CV-1692 (NG), 2008 WL 5401586, at *9 (E.D.N.Y. Dec. 23, 2008) ("[T]he state court acted reasonably in finding that the witness viewing petitioner two times in a photo array did not taint the subsequent lineup."). Thus, simply because the police showed Manoyrine a photo array before the lineup identification does not mean the identification procedures were improper. Further, because there is no indication of undue suggestiveness in the identification procedures, the question of whether Manoyrine's identification of Petitioner was reliable was properly left to the jury. See Jarrett, 802 F.2d at 42.

Accordingly, because the Appellate Division's denial of Petitioner's identification claim was neither contrary to nor an unreasonable application of clearly established federal law, I recommend that the Court deny Ground One of the Petition.

## II. Legal Sufficiency Claim (Ground Two)

Petitioner claims that the evidence of his identity as the perpetrator was legally insufficient. See Pet. at 29–31. Petitioner raised an identical argument before the Appellate Division, but it was fashioned in part as a claim that the "conviction was against weight of the evidence." See ECF No. 18-2 at 55–60.

As a threshold matter, a claim that a verdict was against the weight of the evidence is based in state law and is not cognizable on federal habeas review. Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (collecting cases); see also Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (noting that "assessments of the weight of the evidence . . . are for the jury and not grounds for reversal"). Therefore, to the extent that Petitioner is again raising a "weight of the evidence" claim, I recommend that the Court deny such a claim as not cognizable on habeas review.

Petitioner's legal sufficiency claim, however, is cognizable on federal habeas review. See Douglas, 232 F. Supp. 2d at 113–14. Therefore, pursuant to the deferential standard of review under the AEDPA, the Court examines whether the Appellate Division's decision was contrary to or unreasonably applied clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). Supreme Court precedent regarding legal sufficiency claims establishes "a high bar" for petitioners because such claims are subject to multiple layers of judicial deference. See Coleman v. Johnson, 566 U.S. 650, 651 (2012). First, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam). Second, a reviewing court may overturn a state court decision rejecting a sufficiency of the evidence claim "only if the state court decision was 'objectively unreasonable.'" Id. (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). In addition, the Court must generally "defer to the jury's assessment of credibility," United States v. Vasquez, 267 F.3d 79, 91 (2d Cir. 2001), and must "view[] the evidence in the light most favorable to the prosecution." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

In analyzing the sufficiency of the evidence at trial, the Court also "look[s] to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, the Court takes into account the elements of Petitioner's convictions of first-degree robbery, first-degree assault, second-degree robbery, and second-degree criminal possession of a weapon.[3]

[3] Pursuant to New York Penal Law, a person may be found guilty of first-degree robbery when he "forcibly steals property" and in the course of the crime "[c]auses serious physical injury[;]" "[i]s armed with a deadly weapon; or" "[u]ses or threatens the immediate use of dangerous instrument; or" "[d]isplays what appears to be" a firearm. See N.Y. Penal Law § 160.15. A person may be found guilty of first-degree assault when "[w]ith intent to cause serious physical injury to another person, he causes such injury . . . by means of a deadly weapon or dangerous instrument." See N.Y. Penal Law § 120.10. A person may be

Petitioner specifically claims that the evidence at trial was legally insufficient to support his convictions because (1) "there was no explanation of Conrad Manoyrine's failure to identify Petitioner from the initial photo array;" (2) "the circumstantial evidence not only linked Petitioner to the scene, but also everyone else who attended the club [on the night of the incident];" and (3) "the video [evidence] does not confirm Petitioner's appearance or tattoos." Pet. at 29. These arguments, however, are unavailing on habeas review because Petitioner is essentially asking the Court to reweigh evidence and testimony raised at trial, which the Court is precluded from doing. See Lane v. Graham, No. 14-CV-01261 (JKS), 2016 WL 154111, at *8 (N.D.N.Y. Jan. 12, 2016) ("[T]his Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. . . . [T]his Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction."); see also Foster v. California, 394 U.S. 440, 442 n.2 (1969) (noting that where the identification procedures are not unduly suggestive, "[t]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury"); Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (noting that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal"). In any event, as the Appellate Division found, a review of the underlying record shows that the evidence of Petitioner's guilt was "overwhelming" and more than sufficient to sustain his conviction. See ECF No. 18-3 at 102.

---

found guilty of second-degree robbery in New York when he "forcibly steals property" and when "in the course of the commission of the crime or of immediate flight therefrom, he . . . causes physical injury to any person who is not a participant in the crime." See N.Y. Penal Law § 160.10. Finally, a person can be guilty of second-degree criminal possession of a weapon when he possesses a "loaded firearm" with the "intent to use [it] unlawfully against another." See N.Y. Penal Law § 265.03.

With respect to the victim's identification of Petitioner as the shooter, contrary to Petitioner's claim, Manoyrine did in fact explain during his testimony that he was unable to identify Petitioner when first shown the photo array because he "still was in shock" from the shooting. See ECF No. 18-6 at 161. And Manoyrine's subsequent identification of Petitioner when he viewed the lineup was legally sufficient on its own to support the conviction. See United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979) ("[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.").

In addition, as the Appellate Division concluded, "[e]ven without the victim's identification, the surveillance video and the strong circumstantial evidence linking [Petitioner] to his codefendant and to the scene of the crime still provided overwhelming evidence of guilt." ECF No. 18-3 at 102. The testimony and evidence presented at trial established beyond a reasonable doubt that Petitioner's co-defendant, Weathers, set up Manoyrine to be robbed, and that Petitioner and Weathers worked together to ultimately steal Manoyrine's jewelry. See, e.g., ECF No. 18-3 at 129–55 (showing that between August 8 and August 9, 2016, Weathers and Petitioner called each other several times in the hours leading up to the robbery and over a dozen times right after the robbery occurred); ECF No. 18-6 at 134–37 (Manoyrine testifying that Weathers took a sudden interest in the value of his jewelry on the day of the robbery); id. at 149–50 (Weathers calling Manoyrine shortly after Manoyrine left the club and falsely claiming that he should return because he was with "two girls"); People's Trial Exhibit No. 7 (video evidence showing Weathers conferring with the perpetrators right before the robbery and walking away as soon as Manoyrine returned to the club).

License plate reader data and cell site records also sufficiently established that Petitioner was in the vicinity of the crime when the robbery occurred and that Petitioner fled the area

immediately after the crime. See, e.g., ECF Nos. 18-3 at 156–67 (showing that the red BMW that belonged to Petitioner's mother was near the Mazaar Lounge on the night of the robbery and left the vicinity immediately after the robbery occurred); id. at 168–69 (cell site data showing that Petitioner's cell phone was in the vicinity of the crime when the robbery occurred). Surveillance video evidence and comparison images of Petitioner and the shooter further supported the conviction at trial. See, e.g., ECF No. 18-4 at 2–18; ECF No. 18-7 at 30–34; People's Trial Exhibit No. 35 (comparing still security footage images of the perpetrator with photos of Petitioner and showing multiple similarities between the two).

In light of the substantial evidence raised at trial, a reasonable jury could infer that Petitioner and Weathers were working together to steal Manoyrine's jewelry, that Petitioner was at the Mazaar Lounge on the night of the crime, and that Petitioner was the man who ultimately shot and robbed Manoyrine. Because it is beyond "fairminded disagreement" that the evidence sufficiently supported Petitioner's conviction, Richter, 562 U.S. at 103, the Appellate Division's decision affirming the jury's verdict was not "objectively unreasonable" nor contrary to clearly established Supreme Court precedent governing legal sufficiency claims. See Renico, 559 U.S. at 778. Therefore, I recommend that the Court deny Ground Two of the Petition.

## III. Fourth Amendment Claim (Ground Three)

Petitioner also argues that he should be granted habeas relief because the police lacked probable cause for his arrest. See Pet. at 32. This claim, however, is grounded in the Fourth Amendment, which is generally precluded from habeas review. See Stone v. Powell, 428 U.S. 465, 481–82 (1976). According to well-settled Supreme Court precedent, Fourth Amendment claims are not cognizable in habeas proceedings unless the state court failed to provide the petitioner with an "opportunity for full and fair litigation" of his Fourth Amendment claim. Id. at 494. Generally, a petitioner will have been denied a full and fair opportunity to litigate a Fourth

Amendment claim only if (1) "the state has provided no corrective procedures at all to redress the alleged [F]ourth [A]mendment violation[];" or (2) "the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

The New York state courts provided Petitioner with the appropriate corrective procedures to address his Fourth Amendment claim. Petitioner, with the benefit of counsel at the time, filed a motion to suppress all recovered evidence and the lineup identification following his arrest. He was provided a pre-trial suppression hearing, and thereafter the state court denied his Fourth Amendment claim. See ECF No. 18-2 at 117–25; ECF No. 18-5 at 2–201. Petitioner then raised his Fourth Amendment claim again on direct appeal. See ECF No. 18-2 at 60–62. The Appellate Division denied Petitioner's Fourth Amendment claim on the merits. See ECF No. 18-3 at 252. Petitioner then requested leave to appeal the denial of his Fourth Amendment claim, but the Court of Appeals denied his leave application. See ECF No. 18-3 at 106–22, 127. These steps are the exact corrective procedures that "federal courts have approved . . . for litigating Fourth Amendment claims." Capellan, 975 F.2d at 70 n.1 (internal quotation marks and citations omitted). Accordingly, Petitioner's Fourth Amendment claim is cognizable only if he can show that there was an "unconscionable breakdown" in those corrective procedures. Id. at 70.

To establish that there was an unconscionable breakdown in the state court proceedings, Petitioner must show that the state's corrective processes were rendered "meaningless because the totality of state procedures allegedly did not provide rational conditions for inquiry into federal-law questions." Capellan, 975 F.2d at 70 (cleaned up) (citation omitted). Petitioner, however, fails to allege any breakdown in New York's corrective processes. Rather, his Petition

at most raises disagreements with the state court's conclusions. But such disagreements do not rise to the level of an unconscionable breakdown in the corrective processes he was afforded. See Cappiello v. Hoke, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988), aff'd, 852 F.2d 59 (2d Cir. 1988). ("[A]n unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction it obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society.").

Therefore, because Petitioner fully availed himself of New York's corrective processes for litigating his Fourth Amendment claim and because he has failed to demonstrate any unconscionable breakdown in those processes, I recommend that the Court deny Ground Three of his Petition.

## IV. Ineffective Assistance of Counsel Claim (Ground Four)

Petitioner claims that his conviction should be vacated because his trial counsel provided ineffective assistance. See Pet. at 35–44. Petitioner raised an identical ineffective assistance of counsel claim on direct appeal, however, the Appellate Division found that his claim was "unreviewable . . . because [it] involve[d] matters of strategy and preparation not reflected in, or fully explained by, the record." ECF No. 18-3 at 102–03. The Court subsequently stayed the Petition to allow Petitioner to return to state court to exhaust his ineffective assistance of counsel claim, which he did by filing a motion pursuant to Criminal Procedure Law § 440.10. See ECF Nos. 30; 43-2 at 1–18. Because Petitioner's § 440.10 motion was subsequently denied, and he was not granted leave to appeal, his ineffective assistance of counsel claim is now fully exhausted and ripe for habeas review. See ECF No. 43-2 at 39–43, 60.

Since Petitioner's ineffective assistance of counsel claim was denied on the merits at the state court level, the deferential standard of review under the AEDPA applies. Accordingly, the Court examines whether the state court's denial of his claim was "contrary to, or involved an

unreasonable application of, clearly established Federal Law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). For the purposes of habeas review, the Supreme Court's decision in Strickland v. Washington provides the relevant "clearly established Federal law" with respect to an ineffective assistance of counsel claim. See Knowles v. Mirzayance, 556 U.S. 111, 122–23 (2009); Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006). Under Strickland, to demonstrate ineffective assistance, a petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) that "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687–88 (1984).

Review of counsel's performance is "highly deferential," and the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Rather, prejudice as a result of having ineffective counsel requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Moreover, on habeas review, the "pivotal question" is not simply "whether defense counsel's performance fell below Strickland's standard," but instead "whether the state court's application of the Strickland standard was unreasonable." Richter, 562 U.S. at 101. To meet this standard, Petitioner "must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" Shinn v. Kayer, 592 U.S. 111, 118 (2020) (quoting Richter, 562 U.S. at 103). Therefore, because the Court must give deference to the state court's assessment of counsel's performance in addition to counsel's reasonable judgment, the habeas standard of

review for an ineffective assistance of counsel claim is considered "doubly deferential." Knowles, 556 U.S. at 123.

Petitioner specifically argues that his trial counsel provided ineffective assistance by: (1) failing to adequately "investigate and vet defense witness Anthony Whitehead;" and (2) presenting a third-party culpability defense that "falsely accused . . . Ranger Chery as the perpetrator." See Pet. at 35. The § 440 state court rejected both arguments on the merits.

First, with respect to his claim regarding Whitehead, Petitioner contends that his trial counsel failed to review surveillance video showing that (contrary to Whitehead's testimony) Whitehead did not see Chery on the night of the incident and was not outside of the Mazaar Lounge when the shooting occurred. See id. at 39. The § 440 court concluded, however, that the surveillance video itself did not "establish an absence of strategic or other legitimate reasons for counsel" to have called Whitehead as a defense witness. See ECF No. 43-2 at 41. Moreover, the state court reasoned that this was particularly true given that the defense witnesses "were unknown to each other yet their testimonies were fully corroborative." Id. The § 440 court also observed that Petitioner's trial counsel's "argument that the video evidence was not so clear as to definitively establish [Petitioner's] identity as the perpetrator could apply with equal force to the video alleg[edly] showing [Whitehead] having left the scene" before the shooting occurred. Id. at 42.

The § 440 court reasonably rejected Petitioner's argument regarding trial counsel's vetting of Whitehead as a witness. "[T]he tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997). "Absent an extraordinary showing by the petitioner, such a claim will not merit a finding that

trial counsel performed below the constitutional minimum." Jelinek v. Costello, 247 F. Supp. 2d 212, 289 (E.D.N.Y. 2003). Petitioner has not established such extraordinary circumstances, especially in light of his trial counsel's declaration stating that (1) he did in fact review the surveillance video evidence with Petitioner and the defense witnesses, and (2) Petitioner still asked for Whithead to be called as a trial witness after his counsel shared with Petitioner what Whitehead had said during his interview. See ECF No. 43-2 at 38. Therefore, Petitioner's trial counsel's decision to call Whitehead as a witness was not objectively unreasonable, and the state court's decision finding as much was reasonable given the highly deferential standard under Strickland.

Regarding Petitioner's second argument in support of his ineffective assistance of counsel claim, Petitioner asserts that his trial counsel erred in allowing defense witness Jean Baptiste to testify that Chery was the perpetrator. See Pet. at 42–44. The § 440 court also rejected this argument. Because Jean Baptiste's testimony, if true, would have completely exonerated Petitioner, the § 440 court found that not calling Jean Baptiste as a witness "might itself have been ineffective." See ECF No. 43-2 at 42. The § 440 court also determined that Petitioner's trial counsel "could not possibly have known of the existence of rebuttal evidence that tended to show that [Chery] . . . was not present at the scene on the day of the incident." Id. at 42 n.2. Accordingly, the § 440 court concluded that Petitioner's trial counsel's decision to present a third-party culpability defense was not unreasonable.

The § 440 court reasonably rejected Petitioner's argument regarding the flawed third-party culpability defense. As with trial counsel's decision to call Whitehead as a witness, the decision to call Jean Baptiste as a defense witness was ultimately a "tactical" decision that the § 440 court was "not in a good position to second-guess." Jelinek, 247 F. Supp. 2d at 289.

Moreover, as the § 440 court determined, it would have been unreasonable for Petitioner's trial counsel not to call Jean Baptiste as a witness given the significance of his testimony, which at the time, trial counsel had no way of knowing was false. See ECF No. 43-2 at 41. Thus, a review of the underlying record shows that the § 440 court reasonably applied the Strickland standard in finding that Petitioner's trial counsel's performance did not fall below "an objective standard of reasonableness." Strickland, 466 U.S. at 688.

Petitioner's ineffective assistance of counsel claim also generally fails on habeas review because Petitioner cannot establish any prejudice as a result of his trial counsel's strategic decisions. As the Appellate Division determined, the evidence supporting Petitioner's conviction was "overwhelming." ECF No. 18-3 at 102. In addition to the victim's identification of Petitioner as the perpetrator, the prosecution also presented substantial circumstantial evidence to support the charges. See id. ("The jurors were able to see the [surveillance] video and compare defendant's appearance, including his distinctive tattoos, with the appearance of the assailant shown in the video."). In light of the strength of the prosecution's case, Petitioner has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Accordingly, because Petitioner is unable to sufficiently establish that his trial counsel provided objectively deficient representation or that he suffered prejudice as a result of his trial counsel's performance, the state court reasonably rejected Petitioner's ineffective assistance of counsel claim. As such, I recommend that the Court deny Ground Four of the Petition.

## V. Unsworn Witness and Bolstering Claim (Ground Five)

Petitioner claims, as he did on direct appeal, that he is entitled to relief because the prosecutor improperly "acted as an unsworn witness" and "bolstered Manoyrine's testimony." See Pet. at 45, 47. Petitioner specifically takes issue with the prosecutor's line of questioning

regarding the photo array that Manoyrine was shown. In particular, the prosecutor asked Manoyrine, "And did there come a time that you came to my office and told me you did recognize someone?" ECF No. 18-6 at 162. Manoyrine replied in the affirmative but said that he did not remember when that occurred. Id. at 163. The prosecutor then asked, "So, you told me that you recognized someone at the time?" Id. Defense counsel objected to this question, and the trial court judge sustained the objection, struck the question, and instructed the jury to disregard it. Id. The prosecutor tried asking again, but defense counsel objected a second time, and the judge again sustained the objection. Id. Petitioner claims that through this line of questioning, the prosecutor "stepped past his role as an advocate, became a witness and then persisted and bolstered his witness's testimony in front of the jury." Pet. at 46. The Appellate Division rejected this claim, finding that it was "unpreserved" and, in the alternative, "that any error regarding bolstering or acting as an unsworn witness was harmless." ECF No. 18-3 at 103. Petitioner argues that this harmless error determination was "unreasonable." Pet. at 45.

Petitioner's claim fails for multiple reasons. First, on its face, Petitioner's claim is not cognizable on habeas review. The Supreme Court has held that "federal habeas corpus relief does not lie for errors of state law." Estelle, 502 U.S. at 67 (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Courts in this Circuit have specifically found that "[t]he 'unworn witness' rule is not a federal constitutional right, but rather a New York State rule." Clemmons v. Lee, No. 13-CV-04969 (CS)(JCM), 2021 WL 6750664, at *19 (Oct. 28, 2021), report and recommendation adopted, 2022 WL 255737 (S.D.N.Y. Jan. 27, 2022) (quoting Couser v. Zon, No. 05-CV-1040 (TJM)(VEB), 2008 WL 2440709, at *17 (N.D.N.Y. June 17, 2008)). Similarly, "[b]olstering is a state law evidentiary rule, not a federal constitutional rule, and decisions in this Circuit make clear that bolstering claims are not cognizable on habeas review." Martinez v. Mariuscello, No.

16-CV-7933 (RJS)(AJP), 2017 WL 1234046, at *13 (Apr. 4, 2017), report and recommendation adopted, 2017 WL 2735576 (S.D.N.Y. June 23, 2017).

But even if Petitioner's claim were cognizable, he still would not be entitled to relief on the basis of the Appellate Division's harmless error determination. To obtain relief on habeas review, Petitioner would have to show that: (1) the "error had a 'substantial and injurious' effect or influence on the jury's verdict;" and (2) "the state court's harmless error determination was an unreasonable application of federal law as determined by the Supreme Court." Krivoi v. Chappius, No. 21-2934-PR, 2022 WL 17481816, at *3 (2d Cir. Dec. 7, 2022) (summary order) (citing Brecht v. Abrahamson, 507 U.S. 619, 622–23 (1993), and Brown v. Davenport, 596 U.S. 118, 127 (2022), respectively). Petitioner fails to establish either prong.

With respect to the first requirement, it is highly unlikely that the prosecutor's line of questioning, even if improper, overshadowed the "overwhelming" evidence of Petitioner's guilt. See ECF No. 18-3 at 102. This is especially true considering that the trial court judge sustained defense counsel's objections and explicitly instructed the jury to disregard the prosecutor's question. See ECF No. 18-6 at 163; see also Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow [the Court's] instructions."). Thus, Petitioner's claim does not sufficiently establish that the prosecutor's line of questioning had a "substantial and injurious" impact on the jury's verdict. Brecht, 507 U.S. at 623.

Second, Petitioner fails to show that the Appellate Division unreasonably applied federal law in making its harmless error determination. "When determining the harmlessness of an alleged error, [courts] consider 'the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case.'" Grant v. Racette, No. 21-1888-CV, 2022 WL 17574468, at *2 (2d Cir. Dec. 12, 2022) (quoting Raheem v. Kelly, 257 F.3d 122, 142 (2d Cir.

2001)). In evaluating the "importance" of the claimed wrongly admitted testimony, courts assess "whether the testimony bore on an issue that was critical to the jury's decision; whether it was material to the establishment of the critical fact or whether it was instead corroborated and cumulative; and whether the wrongly admitted evidence was emphasized in arguments to the jury." Young v. Conway, 698 F.3d 69, 87 (2d Cir. 2012). However, "the strength of the prosecution's case 'is probably the single most critical factor in determining whether error was harmless.'" Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) (quoting Latine v. Mann, 25 F.3d 1162, 1167–68 (2d Cir.1994)).

A review of the underlying record shows that the alleged improper questioning was not particularly important to the jury's verdict. Whether or not Manoyrine went to the prosecutor's office to say that he did in fact recognize someone from the photo array is inconsequential given the overwhelming evidence that was brought against Petitioner at trial. As discussed above, in addition to Manoyrine's subsequent lineup identification of Petitioner as the shooter, the prosecution also presented surveillance footage, cell phone records, and license plate reader data to support the charges. Thus, in light of the strength of the prosecution's case, the Appellate Division's harmless error determination was not unreasonable.

Finally, even if Petitioner's arguments were liberally construed to be raising a prosecutorial misconduct claim,[4] such a claim would also be unavailing because it is procedurally barred from habeas review. "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Walker v. Martin, 562 U.S. 307, 315 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)). In particular, federal habeas

---

[4] See, e.g., Atchison v. Artus, 14-CV-06574 (MAT), 2015 WL 2236430, at *4–5 (W.D.N.Y. May 12, 2015) (treating an alleged violation of the unsworn witness rule as raising a claim of prosecutorial misconduct).

review is foreclosed where the state court has "expressly relied on the petitioner's procedural default." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007). A petitioner may, however, overcome a procedural bar by "show[ing] cause for the default and prejudice attributable thereto, or demonstrat[ing] that failure to consider the federal claim will result in a fundamental miscarriage of justice." Harris v. Reed, 489 U.S. 255, 262 (1989) (internal quotation marks and citations omitted).

In its decision, the Appellate Division expressly rejected Petitioner's challenge to the prosecutor's direct examination of Manoyrine because it was "unpreserved." See ECF No. 18-3 at 103. It is apparent from the underlying record that Petitioner's challenge was unpreserved because his trial counsel did not comply with New York's contemporaneous objection rule, which "bar[s] consideration of [a] claim on appeal if the party did not raise a specific constitutional objection in the trial court." Drake v. Woods, 547 F. Supp. 2d 253, 261 (S.D.N.Y. 2008); see N.Y. CPL § 470.05(2). "The Second Circuit has held that the application of New York's contemporaneous objection rule may constitute an independent and adequate state ground that procedurally bars federal habeas review." Id. at 261–62 (citing Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999)).

At trial, Petitioner's attorney did not specifically object when the prosecutor first asked Manoyrine if there had come a time when Manoyrine told the prosecutor that he "did recognize someone." See ECF No. 18-6 at 162–63. Petitioner's trial counsel objected only when the prosecutor asked the question again in a leading format and when the prosecutor asked Manoyrine a third time. See id. at 163. At no point during the challenged line of questioning, however, did Petitioner's trial counsel specify the nature of his objections, let alone alert the trial court that he was objecting to the prosecutor acting as an unsworn witness or bolstering

Manoyrine's testimony. Therefore, the Appellate Division reasonably determined that Petitioner's claim regarding the prosecutor's conduct was unpreserved. Because this determination was based on independent and adequate state law ground (i.e., New York's contemporaneous objection rule), any potential prosecutorial misconduct claim would thus be procedurally barred from habeas review. Moreover, Petitioner has neither demonstrated good cause to excuse his failure to preserve this claim nor presented any "new," "credible," or "compelling" evidence of his innocence that would help overcome this procedural bar. See Hyman v. Brown, 927 F.3d 639, 656–57 (2d Cir. 2019).

Accordingly, because Petitioner's claim regarding the prosecutor's direct examination of Manoyrine is not cognizable and procedurally barred, I recommend that the Court deny Ground Five of the Petition.

**CONCLUSION**

I recommend that the Court deny Petitioner's writ of habeas corpus in its entirety. Moreover, because Petitioner's presumptive conditional release date is scheduled for August 23, 2026, which will likely be before the Court issues its final decision, Petitioner is strongly urged to file a Notice of Change of Address as soon as he is released from incarceration. To assist Petitioner, the Notice of Change of Address form is attached to this Report and Recommendation.

SARAH NETBURN
United States Magistrate Judge

DATED: July 15, 2026
New York, New York

* * *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable Jennifer L. Rochon if required by her Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Rochon. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).

IH-34 Rev:2014-1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

________________________________________

________________________________________

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

________________________________________

________________________________________

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_________ (_____)(_____)

## NOTICE OF CHANGE OF ADDRESS

I hereby notify the Court that my address has changed to the following:

________________________________________

Name (Last, First, MI)

________________________________________

Address City State Zip Code

____________________ ____________________

Telephone Number E-mail Address (if available)

____________________ ____________________

Date Signature